**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **UNITED STATES OF AMERICA** |
| **v.** |
| **WILLIE LAWSON,** |
| **Defendant.** |

**Criminal Action No. 03-282-1 (JDB)**

## MEMORANDUM OPINION

Between December 2001 and April 2002, defendant Willie Lawson committed five armed bank robberies across Virginia, Maryland, and the District of Columbia.  He was tried and convicted by federal courts in each of those jurisdictions, accruing a staggering 909-month sentence of incarceration.  He has now served 242 months (just over twenty years) in prison.  On May 21, 2021, Judge Theodore Chuang of the District of Maryland granted Lawson compassionate release and resentenced him to time served with respect to his convictions in Maryland.  Following Judge Chuang's order, Lawson's only remaining sentence is a partially-served 84-month term of imprisonment imposed by this Court.  Lawson now seeks compassionate release here, asking this Court to eliminate or reduce that outstanding term of imprisonment.  For the reasons set forth below, the Court concludes that Lawson has not put forward extraordinary and compelling reasons warranting a further reduction in his sentence.  Accordingly, the Court will deny Lawson's motion.

### Background

On April 5, 2002, Lawson and co-defendant Gregory Lee Smith robbed a Riggs Bank branch in Washington, D.C.  Gov't Ex. B [ECF No. 216-2] ("Lawson PSR") ¶ 7 (sealed); United States v. Lawson, 410 F.3d 735, 737 (D.C. Cir. 2005)  After the pair entered the bank, Smith threatened the branch manager with a gun and ordered him to unlock the teller line door; once he

did so, Lawson entered the teller line and removed slightly more than $20,000 in cash from the tellers' drawers.  Lawson PSR ¶¶ 7, 13; Lawson, 410 F.3d at 737.  In the meantime, Smith "stood guard in the lobby, his gun trained on the employees and customers."  Lawson, 410 F.3d at 737. Once Lawson finished collecting the money, the two men fled, though they were forced to abandon the money shortly thereafter when dye packs concealed within the bundles of bills exploded.  Id.; Lawson PSR ¶ 7.

Lawson was apprehended three days later by FBI agents investigating a prior robbery committed in Virginia.  Lawson PSR ¶ 9; see also Lawson, 410 F.3d at 738.  Law enforcement eventually connected Lawson to a string of five total armed bank robberies, committed with a rotating cast of associates in Virginia, Maryland, and the District of Columbia.  See generally United States' Opp'n to Def.'s Mot. for Compassionate Release [ECF No. 217] ("Gov't Opp'n") at 2–3 (summarizing facts of these robberies).  Lawson was ultimately charged with ten felonies spread across federal courts in those three jurisdictions: four counts of armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d) (one count in Virginia, two in Maryland, and one in D.C.); two counts of conspiracy to commit armed bank robbery (one each in Virginia and Maryland); and four counts of violating 18 U.S.C. § 924(c)(1), two (in Maryland) for using or carrying a firearm during and in relation to a crime of violence ("using-or-carrying") and two (one each in Virginia and D.C.) for brandishing a firearm during and in relation to a crime of violence ("brandishing").[1] Lawson PSR ¶¶ 1, 37–38.[2]  Prosecutors offered Lawson a global plea deal which would likely

---

[1] The Court will occasionally use "Virginia," "Maryland," and "D.C." to refer, respectively, to the Eastern District of Virginia, the District of Maryland, and the District Court for the District of Columbia.  This shorthand, adopted for the sake of concision, does not refer to state courts in any of those jurisdictions—all proceedings relevant to this motion occurred in federal court.

[2] The pre-sentence report attached to the government's opposition brief incorrectly states that Lawson was convicted of brandishing in Maryland.  Lawson PSR ¶ 38.  Relying on this document, this Court incorrectly stated at argument that Lawson had been convicted of four counts of brandishing.  After Lawson's counsel flagged this issue following that hearing, see Notice of Clarification Regarding Length of Consecutive 18 U.S.C. § 924(c) Sentences [ECF No. 228], the Court obtained copies of the Second Superseding Indictment, Jury Verdict, and Judgment in

have resulted in a sentence of 12 to 15 years in prison, but Lawson rejected this offer and chose to go to trial.  See Mot. for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A) [ECF No. 209] ("Def.'s Mot.") at 9–10; Gov't Opp'n at 4.  Lawson was convicted on all counts in all three districts.

When Lawson was sentenced between 2002 and 2004,[3] violations of 18 U.S.C. § 924(c) were—and to a large extent still are—governed by a complex system of mandatory penalties. Using-or-carrying had a mandatory minimum sentence of five years' incarceration, while brandishing carried a mandatory minimum sentence of seven years.   See 18 U.S.C. § 924(c)(1)(A)(i)–(ii).  A defendant's "second or subsequent conviction" under § 924(c), however, carried a mandatory twenty-five-year minimum sentence.  Id. § 924(c)(1)(C) (effective Nov. 2, 2002 to Dec. 8, 2003).  In Deal v. United States, 508 U.S. 129 (1993), the Supreme Court interpreted this greater punishment to apply even if, at the time the defendant committed the offense in question, he had never previously been convicted of a violation of § 924(c).  United States v. Ruvalcaba, 26 F.4th 14, 30 (1st Cir. 2022) (Barron, J., concurring); see Deal, 508 U.S. at 131–34.  Finally, § 924(c)(1)(D)(ii) required that "no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person."  Thus, whether sentenced to five years for using-or-carrying or twenty-five years for a second or subsequent conviction, a defendant's § 924(c) sentences would "stack," running consecutively to one another and to any other sentences imposed.  See United States v. Gonzales,

---

Lawson's Maryland prosecution, which confirm that Lawson was convicted of using-or-carrying, not brandishing, see Second Superseding Indictment, United States v. Lawson, Crim. No. AW-02-215 (D. Md. Mar. 19, 2003), Dkt. No. 77; Verdict Form, Lawson, Crim. No. AW-02-215 (D. Md. Apr. 8, 2003), Dkt. No. 92; Judgment, Lawson, Crim. No. AW-02-215 (D. Md. July 7, 2003), Dkt. No. 123.  The Court appreciates the diligence of defense counsel in noting this issue and the assistance of the District of Maryland Clerk's Office in resolving it.

[3] Lawson's three sentencings took place between October 11, 2002 (Virginia) and May 12, 2004 (D.C.).  See Lawson PSR ¶¶ 37–38; Min. Entry, May 12, 2004.

520 U.S. 1, 11 (1997) ("[T]he plain language of 18 U.S.C. § 924(c) forbids a federal district court to direct that a term of imprisonment under that statute run concurrently with any other term of imprisonment, whether state or federal.").

With that background in mind, the Court returns to Lawson and the sentences he received. First, Judge Gerald Lee of the Eastern District of Virginia sentenced Lawson to 141 months in prison: 57 months each on the conspiracy and armed robbery counts (to run concurrently), followed by a mandatory consecutive 84-month sentence for brandishing.  Lawson PSR ¶ 37; Judgment, United States v. Lawson, 1:02-cr-302-GBL (E.D. Va. Oct. 11, 2002), Dkt. No. 37. Lawson was next sentenced in Maryland, where Judge Alexander Williams sentenced him to 684 months (57 years) in prison.  Judge Williams imposed concurrent terms of 60, 84, and 84 months on the conspiracy and two armed robbery counts respectively, but Lawson then received two consecutive twenty-five-year terms (a total of 600 months) for his using-or-carrying convictions, as mandated by § 924(c)(1)(C).  Lawson PSR ¶ 38; Judgment, Lawson, Crim. No. AW-02-215 (D. Md. July 7, 2003), Dkt. No. 123.  Combining his 684-month effective sentence in Maryland and his 141-month sentence from Virginia, then, Lawson was already facing 825 months of imprisonment when he came before this Court in 2004 for sentencing on convictions for armed bank robbery and brandishing.

With respect to the armed robbery count (Count One), the Court calculated an adjusted offense level of 27 and criminal history category of V based on 12 criminal history points, resulting in a (then-mandatory) Guidelines range of 120 to 150 months.  See Sent. Tr. [ECF No. 169] at 5:15–8:8.  The Court imposed a sentence of 140 months' incarceration but specified that this sentence would be served concurrently with the sentences Lawson had already received in Virginia and Maryland.  See id. at 18:18–19:4.  The Court then sentenced Lawson to 84 months on the

4

brandishing charge (Count Two), to run consecutively to all other sentences as required by statute.[4]
See id. at 27:17–28:6, 33:1–24; see also 18 U.S.C. § 924(c)(1)(D)(ii).   The result was a total
effective sentence in the three cases of 909 months, or 75 years and nine months.   Lawson's
convictions and sentences were all affirmed on appeal.   See generally United States v. Lawson, 64
F. App'x 380 (4th Cir. 2003) (per curiam); United States v. Lawson, 153 F. App'x 209 (4th Cir.
2005) (per curiam); United States v. Lawson, 410 F.3d 735 (D.C. Cir. 2005).

Fast-forward fourteen years: Congress amended 18 U.S.C. § 924(c)(1)(C) in the First Step
Act of 2018, replacing "second or subsequent conviction"—the language interpreted in Deal—
with "violation . . . that occurs after a prior conviction under this subsection has become final,"
Pub. L. No. 115-391, § 403(a), 132 Stat. 5194, 5221–22.   Thus, a defendant is now subject to a
twenty-five-year mandatory minimum sentence only if he had already been convicted of a previous
§ 924(c) violation at the time he commits a new § 924(c) offense.   Lawson—who committed all
of the relevant offenses before receiving his first § 924(c) conviction—does not fall within the new
rule; applying § 924(c) as amended by the First Step Act, his mandatory minimum sentence for
the two Maryland using-or-carrying convictions would have been ten years instead of fifty.   See
generally Ruvalcaba, 26 F.4th at 29–30 (Barron, J., concurring) (explaining the First Step Act's
amendment of § 924(c) and its effect on defendants in Lawson's position).   The First Step Act did
not, however, alter the mandatory minimum five- and seven-year sentences for first-time
convictions under § 924(c), nor did it change the requirement that § 924(c) sentences run
consecutive to all other terms of imprisonment.   Compare 18 U.S.C. § 924(c)(1) (effective Nov.
2, 2002 to Dec. 8, 2003), with 18 U.S.C. § 924(c)(1) (effective Dec. 21, 2018).

---

[4] The record does not reflect why the Court did not impose a twenty-five-year sentence pursuant to
§ 924(c)(1)(C), as interpreted by Deal.   The Court is forced to conclude that this was an error, though one that inured
to Lawson's benefit and that was never raised by the government.

Lawson sought compassionate release in the District of Maryland in 2020 on the basis of the First Step Act's change in the law and his heightened risk of contracting COVID-19 while incarcerated.  See Gov't Opp'n at 6–7; see generally Suppl. Mot. for Compassionate Release Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), Lawson, Crim. A. No. TDC-02-215 (D. Md. Nov. 4, 2020), ECF No. 370.  On May 21, 2021, Judge Theodore Chuang (who took over the case from Judge Williams) granted Lawson's motion, rejecting his COVID-19 argument but concluding that the significant disparity between the sentence he actually received and the sentence he would likely receive today constituted an extraordinary and compelling circumstance warranting a sentence reduction.  See United States v. Lawson, Crim. A. No. TDC-02-0215, 2021 WL 2042671, at *2–4 (D. Md. May 21, 2021).[5]  Accordingly, Judge Chuang resentenced Lawson to time served on his Maryland convictions, see Am. J., Lawson, Crim. A. No. TDC-02-0215 (D. Md. May 21, 2021), ECF No. 389, though he noted that Lawson would still need to serve the seven-year consecutive sentence imposed by this Court, 2021 WL 2042671, at *4.

On December 2, 2021, Lawson filed the instant motion for compassionate release, asking this Court to reduce or eliminate that seven-year sentence.  Lawson raises several discrete arguments that he contends warrant sentence reduction, either on their own or in combination. Briefly, he argues that (1) if he were sentenced without error and under the current federal sentencing regime, he would likely have received a much lower sentence on Count One (the armed robbery count), Def.'s Mot. at 14–21; (2) his health is poor and places him at heightened risk for a serious course of COVID-19 while incarcerated, id. at 22–26; (3) the computation of his remaining sentence by the Bureau of Prisons ("BOP") is unfair and inconsistent with Judge Chuang's order granting compassionate release, id. at 26–28; and (4) he has demonstrated

---

[5] Judge Chuang's Order is also attached to Lawson's motion.  See Def.'s Ex. 5 [ECF No. 209-5].

extraordinary rehabilitation during his twenty years of incarceration, id. at 28, 34–41. The government filed an opposition to Lawson's motion on February 11, 2022, see generally Gov't Opp'n, and Lawson filed a reply brief on February 25, see generally Reply in Supp. of Def.'s Mot. [ECF No. 221] ("Def.'s Reply"). The Court heard argument on Lawson's compassionate release motion on April 12. See Min. Entry, Apr. 12, 2022. The motion has been fully and ably briefed and argued—it is now ripe for decision.

## Legal Standard

"[I]n any case," a court "may reduce [a] term of imprisonment," if, "after considering the factors set forth in [18 U.S.C.] § 3553(a) to the extent that they are applicable," it concludes that "extraordinary and compelling reasons warrant such a reduction."[6]  18 U.S.C. § 3582(c)(1)(A). An inmate may ask the court for compassionate release directly, but only after "fully exhaust[ing] all administrative rights to appeal a failure of the Bureau of Prisons to bring a [compassionate release] motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Id.  Administrative exhaustion is mandatory under § 3582(c)(1)(A). See, e.g., United States v. Keller, 2 F.4th 1278, 1282 (9th Cir. 2021) (per curiam); United States v. Morales, Crim. A. No. 06-248-4 (JDB), 2021 WL 4622461, at *2–3 (D.D.C. Oct. 7, 2021). Moreover, the statute's exhaustion requirement also "requires the

---

[6] Section 3582(c)(1) authorizes compassionate release "in any case," no exceptions, so even inmates serving mandatory minimum sentences are eligible for compassionate release. E.g., United States v. Halvon, 26 F.4th 566, 570 (2d Cir. 2022) (per curiam) ("[A] mandatory minimum sentence does not preclude a district court from reducing a term of imprisonment on a motion for compassionate release."). Although the Seventh Circuit has expressed "broader concerns" that judges could use compassionate release to effectively countermand Congress's mandatory minimum sentences on the basis of policy disagreements (concerns this Court shares to an extent), United States v. Thacker, 4 F.4th 569, 574 (7th Cir. 2021), the Thacker court immediately clarified that inmates serving mandatory minimum sentences are nonetheless eligible for release, so long as it is granted on other grounds, id. ("[W]e are not saying that extraordinary and compelling individual circumstances . . . cannot in particular cases supply the basis for a discretionary sentencing reduction of a mandatory minimum sentence."); see also United States v. Andrews, 12 F.4th 255, 262 (3d Cir. 2021) (likewise recognizing that defendants serving mandatory minimum sentences are eligible for compassionate release).

inmate to present the same factual basis for the compassionate-release request to the warden" that he presents to the court.  United States v. Douglas, Crim. A. No. 10-171-4 (JDB), 2020 WL 5816244, at *2 (D.D.C. Sept. 30, 2020) ("Douglas I") (internal quotation marks and citation omitted).  In other words, a defendant "may not present one reason to BOP and another to the Court."  Morales, 2021 WL 4622461, at *2.  "[T]he [defendant's] request to the warden need not be identical in detail or specificity to the motion made in court, but there must be a reasonable degree of overlap which gives the BOP a fair opportunity to consider whether to make the motion on the defendant's behalf."  Douglas I, 2020 WL 5816244, at *2 (cleaned up) (quoting United States v. Knight, No. 1:15-CR-393, 2020 WL 4059886, at *2 (M.D.N.C. July 20, 2020)).

Once a defendant has exhausted administrative remedies, the court must make "two essential determinations" before reducing his or her sentence: "whether there are extraordinary and compelling reasons for the reduction," and then "whether . . . section 3553(a)'s purposes of punishment require maintenance of the original prison term."  United States v. Johnson, 464 F. Supp. 3d 22, 30–31 (D.D.C. 2020).  "As the moving party, the defendant bears the burden of establishing that he is eligible for a sentence reduction under § 3582(c)(1)(A)."  United States v. Long, Crim. A. No. 10-171-1 (JDB), 2021 WL 3792949, at *1 (D.D.C. Aug. 26, 2021) (citation omitted).  That burden is substantial: "Cutting short a duly authorized prison sentence is, in the statute's own words, an 'extraordinary' step to take, and it requires a justification which is more than sympathetic and indeed nothing short of 'compelling.'"  United States v. Shabazz, Crim. A. No. 17-43 (JDB), 2021 WL 4306129, at *3 (D.D.C. Sept. 22, 2021).  Although "Congress has not defined with specificity what satisfies this standard, . . . it is clear that the bar is exceedingly high."  Id.

## Analysis

### I. Exhaustion of Administrative Remedies

Before reaching the merits of Lawson's motion, the Court must first address a threshold question—has Lawson exhausted his administrative remedies?  It is uncontested that Lawson has complied with § 3582(c)(1)(A)'s timing requirement: he submitted a request for compassionate release to the warden of his facility on June 2, 2021, see Def.'s Mot. at 14; Def.'s Ex. 6 [ECF No. 209-6] ("June 2 Request"), and filed the present motion on December 2, 2021, more than thirty days later, see Def.'s Mot.; see also Gov't Opp'n at 16 (conceding the above).  But the government identifies four arguments Lawson makes in his motion which he allegedly did not present to BOP and which thus may not be considered now: (1) Lawson's reliance on his allergic rhinitis and osteoarthrosis; (2) his claim that the Court erred in calculating his offense level with respect to Count One; (3) his argument regarding the unfairness of BOP's sentencing computation; and (4) his allegation that he is receiving inadequate medical care.  See Gov't Opp'n at 16–19 (the first three arguments); Rough Tr. of Mot. Hr'g ("Rough Hr'g Tr.") at 30:12–31:4 (inadequate medical care argument).[7]  Lawson responds first that the new medical conditions mentioned in his motion are sufficiently related to the COVID-19 argument he presented to BOP to satisfy issue exhaustion.  Def.'s Reply at 3–5.  He also states that he submitted a supplemental request to his warden on December 2, 2021 (the same day he filed the present motion), in which he raised the Court's alleged error at sentencing and the unfairness of BOP's computation as additional grounds for compassionate release, see Def.'s Reply at 6; Def.'s Ex. 11 [ECF No. 221-1] ("Dec. 2 Request").

---

[7] Citations to the transcript of the April 12 hearing are to a rough draft of the transcript, so discrepancies—both in content and pagination—between the rough and final transcripts may exist. If ordered by a party, a final transcript will be posted to the docket.

Because thirty days have elapsed since that request was received by the warden, Lawson contends that those issues have now been exhausted. Def.'s Reply at 4.

Section 3582(c)(1)'s exhaustion requirement is not jurisdictional, however, see, e.g., United States v. Saladino, 7 F.4th 120, 123 (2d Cir. 2021) (per curiam) (collecting cases); United States v. Edwards, Crim. A. No. 03-234 (JDB), 2021 WL 3128870, at *2 n.4 (D.D.C. July 22, 2021), so a court need not resolve exhaustion when, "even assuming [the defendant] has properly exhausted his request, his motion fails on the merits," Morales, 2021 WL 4622461, at *3 (quoting Edwards, 2021 WL 3128870, at *2); accord United States v. Piles, Crim A. No. 19-292-5 (JDB), 2021 WL 1198019, at *1 n.1 (D.D.C. Mar. 30, 2021). That is the case here. Although the Court is inclined to agree with Lawson that the first three arguments identified by the government have indeed been properly exhausted, the Court ultimately concludes for the reasons explained below that, even considering Lawson's rhinitis and osteoarthrosis, his allegation of error in calculating his adjusted offense level, and the unfairness of BOP's computation of his sentence, Lawson has not demonstrated the existence of extraordinary and compelling reasons warranting a sentence reduction. The Court thus declines to rule on the government's first three exhaustion challenges and will instead assess those arguments on the merits.

Other considerations, however, govern the fourth and final argument to which the government objects: Lawson's claim of inadequate medical treatment. Allegations of inadequate medical treatment while incarcerated can in some cases constitute an extraordinary and compelling reason warranting a sentence reduction. E.g., United States v. Beck, 425 F. Supp. 3d 573, 581–82 (M.D.N.C. 2019) ("[A defendant's] need to obtain adequate treatment for her disease when BoP appears unable to provide it without court oversight is a compelling reason for a sentence reduction."); see also Def.'s Reply at 25 (collecting cases). And Lawson's counsel has offered to

supplement the record in order to bolster this claim, see Rough Hr'g Tr. at 47:10–16, a reasonable

step to take if the claim is properly before the Court.  Thus, it is appropriate to decide whether

Lawson has exhausted this claim.  The Court agrees with the government: he has not.  Because

Lawson did not present this argument to BOP and instead raised it for the first time in his reply

brief, this Court is precluded from considering Lawson's allegations of inadequate medical

treatment in deciding the present motion.

In his reply brief, Lawson alleges that BOP failed to provide him any medication while he

was suffering from COVID-19, characterizing this omission (not unjustifiably) as "inadequate

treatment."  Def.'s Reply at 23–24.  He then connects this charge to allegations that "BOP has

been unable to bring [his] high blood pressure under control" and that he has "received no

treatment for his [gastro-esophageal reflux disease]." Id. at 24.  Lawson's counsel also specifically

argued for release on the basis of inadequate care at the April 12 hearing.  See Rough Hr'g Tr. at

22:14–19 ("[W]hat we are focused on now is the fact that his health has not been properly taken

care of . . . [and] the fact remains that he should have received proper medical care during these

last few years . . . ."); see generally id. at 22:10–26:11.

But this proffered reason for release is entirely absent from either of Lawson's requests to

BOP.  His original June 2 Request did mention his health, but only in the context of the threat of

COVID-19, see June 2 Request at 1 ("The Covid-19 pandemic is not over and Mr. Lawson is

particularly susceptible to its potentially fatal effects because of his age and underlying medical

conditions."), while Lawson's December 2 Request did not discuss his health or medical care at

all, see Dec. 2 Request.  Although "the [defendant's] request to the warden need not be identical

in detail or specificity to the motion made in court," Douglas I, 2020 WL 5816244, at *2 (citation

omitted), there must still be "a reasonable degree of overlap" between the two such that BOP is on

notice of the asserted reasons for release, id. (citation omitted).  That is, a defendant may not "present the Court with an entirely new basis for a sentence reduction."  Knight, 2020 WL 4059886, at *2.

That, however, is exactly what has happened here.  Unlike cases where an inmate's request and motion "ma[ke] the same basic argument" but differ in the details provided, see, e.g., Morales, 2021 WL 4622461, at *3 (suggesting that request and motion both arguing for release due to COVID-19 and underlying health problems but including differing lists of health conditions satisfied issue exhaustion requirement); Edwards, 2021 WL 3128870, at *2 (same), requests for release due to the threat of COVID-19 ask an entirely different question from those seeking release on the basis of inadequate medical care.  The former requires a decisionmaker to assess the likelihood that an inmate will contract COVID-19 and then estimate the chance of that inmate suffering a life-threatening course of the disease based on his or her underlying medical conditions and vaccination status.  Cf. United States v. Engles, Crim. A. No. 19-132 (JDB), 2022 WL 1062937, at *2 (D.D.C. Apr. 8, 2022); Morales, 2021 WL 4622461, at *5–7.  The latter request, on the other hand, asks a decisionmaker to (among other things) evaluate BOP's treatment decisions, determine whether they were or could be the product of sound medical judgment (a determination that may require expert medical evidence), and assess the past and future impact of those decisions on the inmate's health.[8]  Although these inquiries share a few things in common—

---

[8] Cf., e.g., Beck, 425 F. Supp. 3d at 580–82 (granting compassionate release on the basis of BOP's "gross mismanagement" of treatment for defendant's breast cancer, including unexplained months-long delays in arranging necessary medical appointments and disregard for the instructions of defendant's doctors, which "compromised her prospects for survival"); United States v. McCall, 465 F. Supp. 3d 1201, 1204–09 (M.D. Ala. 2020) (finding, after hearing testimony from BOP physicians, an outside medical expert, and the defendant, that BOP had failed to promptly or correctly diagnose the defendant (who suffered from COVID-19 and sickle cell disease), that it had not and likely could not give him the intensive follow-up care he required, and that the defendant would not be adequately protected from reinfection in BOP's care, and accordingly concluding that "the overall inadequate resources at [his facility] to treat [his] condition while it manages its COVID-19 outbreak, in combination, constitute[d] 'extraordinary and compelling' circumstances that warrant [the defendant's] release").

the need to understand the inmate's medical conditions, for example—the thrusts of the two claims are not at all the same.  Put another way, Lawson's argument that he "is particularly susceptible to [COVID-19's] potentially fatal effects because of his age and underlying medical conditions," June 2 Request at 1, could not have put BOP on notice that it would need to defend the quality of its doctors' treatment of Lawson's GERD and high blood pressure.[9]  To give any effect at all to § 3582(c)(1)'s issue exhaustion requirement, the Court must conclude that Lawson has failed to exhaust his claim of inadequate medical treatment.

Bolstering the Court's conclusion is the fact that Lawson did not raise this argument until his reply brief.  The health argument in Lawson's initial motion focuses almost exclusively on the existence of his various medical conditions, Def.'s Mot. at 23–24, and on the concomitant threat posed by COVID-19, see id. at 24–25.[10]  By failing to raise an inadequate medical care claim until his reply brief, Lawson has limited BOP's ability to respond to his allegations and deprived the Court of the factual and legal development it needs in order to evaluate this claim.  In addition to § 3582(c)(1)(A)'s exhaustion requirement, then, Lawson also runs afoul of the well-established principle that "issues may not be raised for the first time in a reply brief."  Nat'l R.R. Passenger Corp. v. Se. Pa. Transp. Auth., 518 F. Supp. 3d 19, 30 (D.D.C. 2021) (cleaned up) (quoting Rollins Env't Servs. (NJ) Inc. v. EPA, 937 F.2d 649, 652 n.2 (D.C. Cir. 1991)).

---

[9] Nor can BOP be deemed to be on notice of Lawson's argument simply by virtue of possessing his medical records.  See Edwards, 2021 WL 3128870, at *2 (suggesting for this reason that "[t]he warden at FCI Berlin . . . arguably had notice that [defendant] suffered from [conditions not listed in the administrative request] when reviewing his initial request").  Rather than a pure statement of fact, a claim of inadequate medical treatment is a characterization requiring significant factual elaboration and legal argument that BOP cannot be expected to apply to its own conduct sua sponte.

[10] Although Lawson did note that "[inmates'] increased medical needs behind bars may be . . . a consequence of inadequate care" and that shortages of correctional officers during the pandemic have imperiled inmate medical treatment, id. at 22–23, those are general statements about the prison system as a whole and cannot reasonably be read as allegations that Lawson specifically is being provided inadequate medical care.

None of this is to say that Lawson has not identified real problems. If true, his allegations that BOP medical staff have failed to take ordinary steps in treating his hypertension and GERD despite repeated requests are concerning and deserve to be examined. The Court thus encourages Lawson to present these concerns to the warden of FCI Coleman, develop a further record supporting his claims, and, if no relief from BOP is forthcoming, return to this Court if he continues to believe that the quality of his medical care warrants a reduction in his sentence. At present, however, this claim is simply not properly before the Court.

## II.      Extraordinary and Compelling Reasons

Having addressed exhaustion, the Court now proceeds to the meat of Lawson's motion: whether extraordinary and compelling reasons exist justifying a reduction in his sentence. "The principal requirement of the [compassionate release] statute is that the defendant must present 'extraordinary and compelling reasons that warrant such a reduction.'" United States v. Jackson, 26 F.4th 994, 1001 (D.C. Cir. 2022) (cleaned up) (quoting 18 U.S.C. § 3582(c)(1)(A)(i)). Lawson advances four reasons that he contends are "extraordinary and compelling," either on their own or considered together: (1) if sentenced without error under federal sentencing law as it exists today, Lawson would likely have received a lower sentence on Count One; (2) Lawson suffers from several health issues which put him at a heightened risk for contracting COVID-19 while in prison; (3) BOP's recent computations of Lawson's sentence are unfair and inconsistent with Judge Chuang's compassionate release order; and (4) Lawson has shown "impressive rehabilitation" during his twenty years in prison. See generally Def.'s Mot. at 14–30. The Court will address each of these proffered reasons in turn.

### A.       Sentencing Errors and Changes in the Law

Lawson's first reason for compassionate release relates to his sentence for armed bank robbery (Count One). Recall that the Court calculated an adjusted offense level of 27 and a

criminal history category of V based on twelve criminal history points, resulting in a mandatory

Guidelines range of 120 to 150 months, and ultimately imposed a sentence of 140 months, to run

concurrently with the terms already imposed by the Virginia and Maryland courts.  Lawson now

contends that this Court erred in calculating his offense level and his criminal history category,

Def.'s Mot. at 14–16, and that changes in the law—both the 2010 repeal of a Guidelines provision

underlying two of his twelve criminal history points, id. at 16, and the "watershed changes in

criminal justice sentencing" rendering the Guidelines only advisory, id. at 18–21—mean that he

would have received a much lower sentence on Count One today.  In other words, if sentenced

without error and under today's sentencing regime, Lawson's Guidelines range for Count One

would have been significantly lower, and he likely would have received a much lighter sentence,

possibly as little as one day.  See id. at 16, 19.  This disparity, he contends, justifies compassionate

release.[11]  Id. at 18, 21.

---

[11] The parties dispute whether subsequent, nonretroactive changes in the law—in this case, changes in the
sentencing regime—may be considered an "extraordinary and compelling reason" for purposes of compassionate
release.  See Gov't Opp'n at 21–22 (noting cases on both sides); Def.'s Reply at 6–11.  This question has divided
judges in this District, compare United States v. Hicks, Crim. A. No. 93-97-2 (BAH), 2021 WL 1634692, at *8 (D.D.C.
Apr. 27, 2021) (answering in the negative), with United States v. Williams, Crim. A. No. 91-559-6 (TFH), 2021 WL
5206206, at *4 (D.D.C. Nov. 9, 2021) (answering in the affirmative), and United States v. Price, 496 F. Supp. 3d 83,
88 (D.D.C. 2020) (same), and it has split the courts of appeals, compare United States v. Crandall, 25 F.4th 582, 585–
86 (8th Cir. 2022) (holding that First Step Act's non-retroactive amendment to § 924(c)(1)(C) is a "legally
impermissible" ground for compassionate release), and United States v. Andrews, 12 F.4th 255, 261–62 (3d Cir. 2021)
("The nonretroactive changes to the § 924(c) mandatory minimums . . . cannot be a basis for compassionate release."),
and United States v. Thacker, 4 F.4th 569, 573–75 (7th Cir. 2021) (same), and United States v. Tomes, 990 F.3d 500,
505 (6th Cir. 2021) (same with respect to First Step Act's non-retroactive amendment of 21 U.S.C. § 841(b)(1)(A) ),
with United States v. Ruvalcaba, 26 F.4th 14, 24–26 (1st Cir. 2022) (holding that "a district court may consider the
[First Step Act's] prospective amendments to sentencing law as part of the 'extraordinary and compelling' calculus"),
and United States v. McGee, 992 F.3d 1035, 1047–48 (10th Cir. 2021) (same), and United States v. McCoy, 981 F.3d
271, 285–88 (4th Cir. 2020) (same), and United States v. McCall, 20 F.4th 1108, 1113–14 (6th Cir. 2021) (same with
respect to subsequent judicial interpretation of criminal statute), vacated pending rhr'g en banc, 29 F.4th 816 (Mem.)
(6th Cir. Apr. 1, 2022).

      Moreover, the Supreme Court recently held in Concepcion v. United States, No. 20-1650, 2022 WL 2295029
(U.S. June 27, 2022), that, when resentencing an offender pursuant to § 404(b) of the First Step Act of 2018—which
permits courts to "impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 . . . were in
effect at the time the covered offense was committed," Pub. L. 115–391, § 404(b), 132 Stat. 5194, 5222—a court may
factor in other considerations, including unrelated non-retroactive changes in the Sentencing Guidelines and evidence
of rehabilitation.  See Concepcion, 2022 WL 2295029, at *9–12.  Although not precisely on point—Concepcion says
nothing directly about what can constitute "extraordinary and compelling reasons" under § 3582(c)(1)(A)—the
Court's conclusion that "[t]he discretion federal judges hold at initial sentencings also characterizes sentencing

Many of Lawson's factual premises are correct: the Sentencing Guidelines are indeed now advisory; they no longer provide for the two "recency points" reflected in Lawson's criminal history category; and, regrettably, it does appear that the Court erred in calculating Lawson's offense level.[12]  But Lawson's argument runs into one crucial problem: every alleged error and change in the law on which Lawson relies pertains exclusively to his sentence on Count One, which the Court ordered to run concurrently with the sentences Lawson had already received.  And although the Court's 140-month sentence could not run concurrently with Lawson's prior § 924(c)

modification hearings" and its statement that "[t]he only limitations on a court's discretion to consider any relevant materials at an initial sentencing or in modifying that sentence are those set forth by Congress in a statute or by the Constitution," 2022 WL 2295029, at *8 (emphasis added), offer indirect (though not insubstantial) support for the view that any nonfrivolous reason for release not expressly forbidden from consideration, including subsequent non-retroactive changes in either the Guidelines or statutory provisions, may be considered when determining whether "extraordinary and compelling reasons" exist.

Nonetheless, the D.C. Circuit has not taken a position on this issue, see United States v. Perkins, 857 F. App'x 663, 664 (D.C. Cir. 2021) (noting that "courts have concluded that 'stacking' of § 924(c) counts may present an extraordinary and compelling reason under § 3582(c)(1)(A)" but declining to weigh in), nor must this Court do so here: for the reasons explained below, even assuming that non-retroactive changes in the law can justify compassionate release, they do not in this case.

[12]  The Court applied a five-level offense-level increase pursuant to U.S. Sentencing Guidelines § 2B3.1(b)(2)(C), which called for such an increase "if a firearm was brandished or possessed" during a robbery.  See U.S. Sent'g Guidelines Manual § 2B3.1(b)(2)(C) (U.S. Sent'g Comm'n 2003) ("2003 USSG").  But § 2K2.4, which governed sentencing for § 924(c) convictions, directed courts not to apply "any specific offense characteristic for possession, brandishing, use, or discharge of an explosive or firearm" with respect to the underlying offense if the defendant is also being sentenced for a § 924(c) offense.  2003 USSG § 2K2.4 cmt. n.4.  The Court thus should not have applied the § 2B3.1(b)(2)(C) five-level increase, Lawson's final offense level as to Count One should have been 22, and (leaving the rest of the Court's calculation unchanged) his Guidelines range should have been 77–96 months.  However, Lawson did not make this particular argument regarding USSG § 2K2.4 at sentencing, see Sent. Tr. at 3:6–19; 8:23–9:4; he did not raise it on appeal, see Lawson, 410 F.3d 735; nor did it come up in any of his (unsuccessful) motions for post-conviction relief in this Court, see Mot. to Vacate Under 28 U.S.C. § 2255 [ECF No. 142]; Suppl. to Mot. to Vacate Under 28 U.S.C. § 2255 [ECF No. 143]; Second Suppl. to Mot. to Vacate Under 28 U.S.C. § 2255 [ECF No. 144]; Motion for Relief Pursuant to Rule 60(b)(6) [ECF No. 161]; Mot. to Correct Sentence [ECF No. 174]; Mot. Under 28 U.S.C. § 2255 [ECF No. 180].

The Court is not persuaded, however, that Lawson's criminal history category calculation was erroneous. Lawson's argument rests on the assumption that the five robberies at issue were "part of a single common scheme or plan" and were therefore "related" for purposes of USSG § 4A1.1(f).  See Def.'s Mot. at 15–16; 2003 USSG § 4A1.2 cmt. n.3 (defining "related case").  But as far as the Court can tell, this is only an assumption: the Court did not make any such finding of relatedness in 2004, and the government took the opposite position at sentencing, see Sent. Tr. at 14:25–15:4.  Moreover, even if the robberies had been deemed related, Lawson would have received four points, not two, for his Maryland and Virginia convictions.  Contra Def.'s Mot. at 15–16.  As illustrated by the uncannily apt example in Application Note 6 to § 4A1.1, see 2003 USSG § 4A1.1 cmt. n.6, the two sentences would have been treated as one sentence for purposes of § 4A1.1(a) and result in three points, id. § 4A1.1(a); see also id. § 4A1.2(a)(2) ("Prior sentences imposed in related cases are to be treated as one sentence for purposes of §4A1.1(a) . . . ."), and then one additional point would have been added under § 4A1.1(f).

sentences, see Gonzales, 520 U.S. at 11, it could (and has) run concurrently to his non-§ 924(c)

sentences from Virginia and Maryland (those for armed robbery and conspiracy), which totaled

141 months.[13]  The upshot is that Lawson's 140-month sentence from this Court on Count One

never factored into how long he would serve in prison—even if the Court had sentenced Lawson

to one day, as he suggests it might have, Def.'s Mot. at 19–20, Lawson still would have faced the

same number of months in prison.  The only sentence from this Court that had any real effect was

the seven-year sentence for brandishing, and if sentencing Lawson today, the Court would still be

obligated to impose that same mandatory minimum sentence.[14]  See 18 U.S.C. § 924(c)(1)(A)(ii).

Any error made by the Court at sentencing was thus harmless, and applying the current federal

sentencing regime to Lawson's case would make no difference in his effective sentence.[15]  If

sentenced without error today, the formalities of Lawson's sentence would have changed but his

actual time-to-serve would not—this fact means that Lawson's arguments regarding his sentencing

---

[13] As explained above, Lawson received 57 months each (running concurrently) on the conspiracy and armed robbery counts in Virginia and concurrent terms of 60, 84, and 84 months, respectively, on the conspiracy and two armed robbery counts in Maryland.  The Virginia and Maryland sentences were to be served consecutive to one another.  See, e.g., 18 U.S.C. § 3584(a) (establishing default rule in favor of consecutive sentences); Decl. of Angela Kelly [ECF No. 224-1] ¶ 7 (applying this rule to Lawson's Virginia and Maryland sentences).  Thus, by the time the Court sentenced Lawson to 140 months on Count One, to run concurrently with all other eligible (i.e., non-§ 924(c)) sentences, he had already received a total of 141 months of non-§ 924(c) sentences for his other bank robberies.

[14] Indeed, if Lawson was sentenced for the same crimes but under current law, and if all three sentencing judges then varied downward to the greatest extent possible, sentencing Lawson to one day in prison on every count that did not carry a mandatory minimum, Lawson would still face a mandatory minimum aggregate sentence of 24 years in prison (seven years each for the brandishing convictions in Virginia and D.C. and five years each for the two using-or-carrying convictions in Maryland).  E.g., Notice of Clarification Regarding Length of Consecutive 18 U.S.C. § 924(c) Sentences.  The Court struggles to conclude that changes in the law render sentence reduction appropriate when, even if the defendant received the maximum conceivable benefit of those changes, the resulting sentence would still be longer (not accounting for good-time credit) than the time he has already served.

[15] Appellate courts routinely apply essentially the same reasoning to reject challenges to the length of sentences when "the presence of identical concurrent sentences [means that] a ruling in the defendant's favor would not reduce the time he is required to serve or otherwise prejudice him in any way."  Kassir v. United States, 3 F.4th 556, 561 (2d Cir. 2021) (cleaned up; citations and footnote omitted); accord, e.g., Duka v. United States, 27 F.4th 189, 194 (3d Cir. 2022) (applying doctrine "where, regardless of the outcome, the defendant will remain subject to the same sentence"); United States v. Agramonte, 276 F.3d 594, 598 (D.C. Cir. 2001).  Though not directly applicable here, the Court finds the concurrent sentence doctrine instructive insofar as it corroborates the Court's view that an error which could not have affected the length of a defendant's effective sentence is an inadequate ground for release.

and subsequent changes in the law are not extraordinary and compelling reasons warranting compassionate release.[16]

Lawson also argues that he could have—and, if prosecuted today, likely would have—been prosecuted in one jurisdiction with one indictment rather than in three separate proceedings.[17]  If this had occurred, Lawson claims, he likely would have been charged with fewer or less serious crimes and accordingly would have faced fewer mandatory minimum sentences.  See Def.'s Mot. at 20–21; Rough Hr'g Tr. at 12:17–24, 13:7–17.  Even assuming that this argument could constitute an extraordinary and compelling reason for compassionate release, the Court does not find Lawson's proposed inference warranted.

At the outset, even if the five robberies at issue could have been brought in one indictment in the same district,[18] the number of different venues or indictments is not necessarily connected to the substance or number of charges brought.  Lawson could just as easily have been charged with the same ten felonies in one indictment as in three.  Supporting his claim that he nonetheless

---

[16] Lawson cites several cases in which courts have concluded that errors made at sentencing supported compassionate release.  See Def.'s Mot. at 16–18.  But in each of those cases, the error in question had a real effect on the amount of time the defendant was required to serve—none of the cases Lawson cites support the proposition that an error rendered meaningless by a longer concurrent sentence is an "extraordinary and compelling reason" warranting a sentence reduction.

[17] To the extent Lawson argues that prosecutors should have charged him this way, see generally Rough Hr'g Tr. at 13:7–15:5, the Court is, as always, reluctant to second-guess the exercise of prosecutorial discretion.  See generally United States v. Fokker Servs. B.V., 818 F.3d 733, 741 (D.C. Cir. 2016).  And here, Lawson has identified no flaw in the now-twenty-year-old charging decision other than that it subjected him to greater criminal liability than another decision might have.  The mere fact that a prosecutor did not elect to charge a defendant with fewer crimes than were supported by the evidence is not an "extraordinary and compelling" circumstance warranting release from a duly authorized sentence of imprisonment.  See United States v. Andrews, 480 F. Supp. 3d 669, 686 (E.D. Pa. Aug. 19, 2020) (rejecting argument for compassionate release on the basis of prosecutor's charging decision because "[t]here is no evidence that [defendant] was singled out or treated differently" and "the prosecutors followed applicable prosecutorial policies"), aff'd, 12 F.4th 255, 262 (3d Cir. 2021).

[18] This is indeed an assumption.  To be charged in one jurisdiction, Lawson's individual bank robberies would need to be deemed an offense which was "begun, continued, or completed" in more than one district.  18 U.S.C. § 3237.  As referenced above, the record is not at all clear that Lawson's robberies are best understood as one continuing offense—indeed, the government explicitly argued at sentencing that they were not part of a common scheme or plan.  Sent. Tr. at 14:25–15:4.  And to be charged in one indictment, the robberies would need to satisfy a similar test: they must be "of the same or similar character," "based on the same act or transaction," or be "connected with or constitute parts of a common scheme or plan."  Fed. R. Crim. P. 8(a).

would have faced fewer charges if prosecuted today, Lawson notes that the Department of Justice's prosecutorial guidance has "changed over time," including becoming more lenient when President Biden took office.  <u>See</u> Def.'s Mot. at 21.  But Lawson identifies no since-rescinded policy mandating his 2002 charges, and the mere fact that charging guidance may change with administrations is not determinative as to whether Lawson would be prosecuted differently today.[19]  To the extent Lawson claims that he was prejudiced by being charged during the stricter Bush administration rather than the more lenient Biden administration, <u>see</u> <u>id.</u>, neither the enforcement priorities of a given Attorney General nor the political party of a given President are appropriate grounds for reducing a sentence.  Lawson also points to Judge Chuang's comment that "under present practice in [the District of Maryland], the Government may not have even charged two different § 924(c) charges in the same prosecution."  <u>Lawson</u>, 2021 WL 2042671, at *2.  But Judge Chuang's sense of current practices in Maryland is an insufficient basis for this Court to infer that, if prosecuted today, Lawson would have faced fewer or less serious charges than the facts supported.  In short, the Court considers Lawson's contention too speculative to constitute an extraordinary and compelling reason favoring release.

For this reason, Lawson's reliance on now-Justice Ketanji Brown Jackson's sentencing decision in <u>United States v. Dunlap</u>, Case No. 17-cr-207 (KBJ), is misplaced.  <u>See</u> Def.'s Mot. at 20; Rough Hr'g Tr. at 12:17–13:17.  In that case, the defendant committed three bank robberies—one in Maryland and two in D.C.—over the course of one month, but although he was prosecuted

---

[19] <u>See</u> <u>United States v. Rodriguez</u>, 451 F. Supp. 3d 392, 405 n.32 (E.D. Pa. 2020) (rejecting defendant's argument that changes in DOJ charging policy supported compassionate release, since he "ha[d] not demonstrated that he would be charged differently today" or that "under current DOJ policy he would not have been charged with violating 18 U.S.C. § 924(c)"); <u>see also</u> Mot. to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at 10, <u>Rodriguez</u>, 451 F. Supp. 3d 392 (E.D. Pa. 2020) (Case No. 03-CR-271-1), ECF No. 127 (articulating argument ultimately rejected by court: "The prosecution had the choice whether to charge Mr. Rodriguez under Section 924(c) and under recent DOJ policy, it is quite possible it would not have done so today.  Mr. Rodriguez should be afforded the benefit of this change in official policy.").

for the Maryland robbery in state court in 2015, he was not indicted in federal court on the two D.C. robberies until two years later.  See Sent. Tr. at 23:9–22, Dunlap, Case No. 17-cr-207 (KBJ) (D.D.C. Sept. 11, 2018), ECF No. 35 ("Dunlap Sent. Tr.").  Because his prior Maryland conviction increased Dunlap's criminal history category compared to what it would have been had the three robberies been prosecuted together, id. at 23:23–24:8, Judge Jackson varied downward from Dunlap's Guidelines range in order to "treat these offenses, from a sentencing standpoint, consistently with what I believe . . . should have happened, which is . . . that [the defendant] should have been charged and sentenced for these acts together," id. at 24:22–25:2.  But in Dunlap there was a direct line between the prosecutor's joinder decision and a higher sentence: had he been prosecuted in one indictment, Dunlap's criminal history category and Guidelines range would have automatically been lower.  See id. at 23:23–24:8, 25:3–13.  There is no such direct causal connection here; Lawson must instead rely on speculation that a single indictment would have included fewer offenses in order to result in a lesser sentence.  Dunlap thus offers Lawson little support.

In sum, none of Lawson's arguments regarding his charges or sentencing support sentence reduction.  Due to his other concurrent sentences, Lawson's sentence on Count One had no impact on how much time he would actually serve, so neither errors in his Guidelines calculation nor the possibility of a downward variance would have altered his aggregate sentence of imprisonment. Nor is the Court persuaded by Lawson's speculation that, if prosecuted today, he would have been charged differently—the mere possibility that prosecutors could have charged him with fewer offenses does not support reducing his sentence.

###### B.    Lawson's Health Conditions and the Threat of COVID-19

Lawson's second set of arguments in favor of compassionate release relate to his health.[20] Lawson suffers from several medical conditions, including obesity, hypertension, hyperlipidemia, allergic rhinitis, sinusitis, gastro-esophageal reflux disease, and osteoarthrosis, Def.'s Mot. at 23, and he argues that, while "[t]hese conditions are troublesome in their own right," id. at 24, they are particularly concerning given how they magnify the threat posed by COVID-19, id. at 24–25.[21] Underlining the seriousness of this threat, Lawson contracted COVID-19 during the pendency of this motion, and he represents that he suffered from moderate symptoms of the disease for nearly a month. See Def.'s Reply at 23; Def.'s Ex. 13 [ECF No. 221-3] (email from Lawson to his counsel discussing his symptoms).

But Lawson also candidly acknowledges that he has chosen not to receive a COVID-19 vaccine "over fears of adverse reactions . . . while imprisoned." Def.'s Mot. at 25. That is his right, and the Court recognizes that whether to receive a vaccine may present different considerations for incarcerated individuals than for those not in prison. See Def.'s Mot. at 25 ("Decades of subpar medical care have alienated those behind bars, leading many . . . to say they worry th[at] medical staff may not properly store or handle the vaccine . . . . Some worry they'd be left to languish in their cells if they had an adverse reaction to the vaccine." (quoting Nicole Lewis, We Asked People Behind Bars How They Feel About Getting Vaccinated, The Marshall Project (Mar. 1, 2021))); United States v. Sumler, Crim. A. No. 95-154-2 (BAH), 2021 WL 6134594, at *26 (D.D.C. Dec. 28, 2021) (noting that "incarcerated people lack the same ability to

---

[20] The Court has already addressed one such argument—that Lawson is receiving inadequate medical care in BOP custody—and concluded that Lawson failed to exhaust administrative remedies with respect to that claim.

[21] For instance, Lawson notes that hypertension is a recognized risk factor for severe courses of COVID-19 and that symptoms of rhinitis and sinusitis can mask early indicia of COVID, thereby making diagnosis more difficult. See Def.'s Mot. at 24–25.

consult a doctor of their choosing to discuss the pros and cons of vaccination that is available to the general population").

Nonetheless, as this Court, other judges in this District, and dozens of federal courts around the country have noted, the availability of vaccines has entirely changed the calculus for compassionate release on the basis of COVID-19.  See, e.g., United States v. Clark, Crim. No. 10-0133 (PLF), 2021 WL 5630795, at *4 (D.D.C. Dec. 1, 2021) (noting that "the remarkable effectiveness of these vaccines raises an extremely high bar to establishing extraordinary and compelling reasons for a sentence reduction based on the risk of contracting COVID-19" and collecting cases).  Indeed, the Sixth Circuit has gone so far as to state that, "if an inmate does not present a compelling reason justifying the failure to be vaccinated despite access to the vaccine, a district court would abuse its discretion by granting a motion seeking a sentence reduction under § 3582(c)(1)(A)(i) on the grounds that COVID-19 constitutes an extraordinary and compelling justification." United States v. Lemons, 15 F.4th 747, 751 (6th Cir. 2021); accord United States v. Broadfield, 5 F.4th 801, 803 (7th Cir. 2021) ("[F]or the vast majority of prisoners, the availability of a vaccine makes it impossible to conclude that the risk of COVID-19 is an 'extraordinary and compelling' reason for immediate release.").  The Court generally agrees, and it particularly concurs with Chief Judge Howell that "to grant compassionate release to a defendant because of the risks posed to him by the COVID-19 pandemic, when he has refused to take steps to mitigate those risks, flies in the face of all logic." Sumler, 2021 WL 6134594, at *26.  Accordingly, in light of Lawson's decision not to receive a safe and effective vaccine against COVID-19, the threat posed by that disease cannot support a reduction in his sentence.

Lawson also makes more general health-related arguments.  He notes that the stresses of incarceration mean that, "[b]y aging inside BOP's walls, Mr. Lawson's physiological age is likely

far greater than his years," Def.'s Mot. at 22, and he points to the fact that lockdowns and other restrictions designed to mitigate the spread of COVID-19 have "increased the severity of the sentence he has served so far," Def.'s Reply at 21–22.  He also notes that staff shortages at federal prisons can imperil the provision of medical care and other inmate services.  Def.'s Mot. at 22–23.  The Court disputes none of these factual assertions, and particularly not Lawson's statement that the "pandemic rendered [his] conditions of confinement harsher over the past 20 months than they normally would have been."  Id. at 23.  The effect of the pandemic on prisoners—not just the infections and deaths of inmates but also the concomitant restrictions intended to reduce transmission of the disease—has been a deeply unfortunate and underappreciated consequence of the pandemic.

But those effects, no matter how unfortunate, are also almost universal in the federal prison population; as a consequence, they cannot support a finding of "extraordinary and compelling reasons."  A reason applicable to the vast majority of federal inmates is by its terms not "extraordinary."  See Engles, 2022 WL 1062937, at *4 (rejecting argument for compassionate release based on poor conditions at site of incarceration because "[defendant's] allegations . . . even assuming their truth, are applicable to every one of the more than 3,000 inmates at [the same facility]"); see also Extraordinary, Oxford English Dictionary (3d ed. 2022) (defining word as "[o]ut of the usual or regular course or order" or "[o]f a kind not usually met with; exceptional; unusual; singular").  Regrettable as they may be, staffing shortages and the consequences of pandemic lockdowns are far from "exceptional," "unusual," or "singular"—they are thus not "extraordinary and compelling reasons" warranting a reduction in Lawson's sentence.

### C.    BOP's Computation of Lawson's Remaining Sentence

Lawson next contends that BOP's computation of his sentence following Judge Chuang's grant of compassionate release in May 2021 is "fundamentally unfair" and warrants a reduction in this Court's sentence.  See Reply to BOP Decl. [ECF No. 227] ("Def.'s Reply to BOP Decl.") at 4.  BOP has computed Lawson's sentence several times since Judge Chuang resentenced him to time served, each time arriving at a different result.  See Def.'s Ex. 7 [ECF No. 209-7] (May 25, 2021 computation); Def.'s Ex. 8 [ECF No. 209-8] (Oct. 26, 2021 computation); Gov't Ex. A [ECF No. 217-1] (January 10, 2022 computation).  In part because of Lawson's representation that BOP had failed to explain the discrepancies between these calculations, the Court ordered BOP to submit an affidavit setting out the reasoning underlying its computation of Lawson's sentence. See Order, Mar. 4, 2022 [ECF No. 222].  The government accordingly filed a declaration by Angela Kelly, a correctional programs specialist at BOP's Designation and Sentence Computation Center, explaining BOP's computation methodology in this case and attaching the newest computation of Lawson's sentence.  See Decl. of Angela Kelly [ECF No. 224-1] ("BOP Decl."); Attach. 14 to Decl. of Angela Kelly [ECF No. 224-2] at 50 (computation dated March 25, 2022);[22] see also Def.'s Reply to BOP Decl. at 1–2 (summarizing BOP's four computations in a table). Both parties then submitted timely responses to BOP's declaration.  See generally United States' Statement Regarding BOP Decl. [ECF No. 226] ("Gov't Reply to BOP Decl."); Def.'s Reply to BOP Decl.

The most recent computation of Lawson's sentence projects a release date of May 8, 2027, and a term expiration date of February 19, 2031.  See BOP Decl. ¶ 15; Attach. 14 to BOP Decl. at

---

[22] The BOP Declaration is accompanied by 14 attachments, filed together in one document at ECF No. 224-2.  Attachment 14 is BOP's most recent computation, which begins on page 46 of the combined document.  Because the attachments are continuously paginated, the Court uses the page numbers from the combined document.

50.   In other words, if the remainder of Lawson's sentence goes smoothly and he retains all previously-accrued good-time credit while earning the maximum allowable credit going forward, he will be released in May 2027; on the other hand, if his previously-accrued and future good-time credit were to be revoked as a disciplinary sanction (as all parties agree is possible, see BOP Decl. ¶ 14; Def.'s Reply to BOP Decl. at 3), then Lawson would remain incarcerated until February 2031.

BOP arrived at this computation, as the Court understands it, by essentially asking itself a hypothetical question upon receiving Lawson's amended sentence in May 2021: "If an inmate otherwise identical to Lawson (not counting his additional consecutive sentence) was entitled to release on May 21, 2021, how long would his original sentence need to have been?"  The answer, BOP calculated, is 21 years, 10 months, and 14 days.  BOP Decl. ¶ 12(c).  It then added the seven-year sentence imposed by this Court to this term (which accounted for Lawson's Virginia and Maryland sentences, see id. ¶ 12 (c)–(d)), arriving at a total term-in-effect of 28 years, 10 months, and 14 days and a term expiration date in February 2031.  Particularly relevant here is how BOP treated Lawson's good-time credit.  When answering its hypothetical question, BOP factored in not just the good-time credit Lawson had already accrued as of May 2021 but also the credit he would have been eligible to receive had he actually been sentenced to a term of 21 years, 10 months, and 14 days: 1,181 days.[23]  Subtracting 176 days of credit that Lawson had previously lost due to disciplinary infractions, BOP effectively baked 1,005 days of good-time credit into its computation of his time-served sentence and, accordingly, into his new total term-in-effect.

---

[23] Lawson criticizes this move, not without reason, as circular: "The BOP arrives at X (1,005 days of good time credit) by assuming Y (the sentence is 21 years and 10 months), but the only way it calculates Y (a sentence of 21 years and 10 months) is by assuming X (1,005 days of good time credit)."  Def.'s Reply to BOP Decl. at 2.

Lawson argues vigorously against BOP's methodology and particularly its treatment of his good-time credit. <u>See generally</u> Def.'s Reply to BOP Decl. at 2–3. He notes that BOP's February 2031 term-expiration date is almost <u>ten</u> years from the date Judge Chuang eliminated all of Lawson's sentences except for this Court's <u>seven</u>-year term. <u>Id.</u> at 3. Indeed, Lawson notes that Judge Chuang partially based his compassionate release decision on the assumption that Lawson would have no more than seven years left to serve. <u>Id.</u> at 4; Def.'s Mot at 26–27; <u>see</u> <u>Lawson</u>, 2021 WL 2042671, at *4. This discrepancy, Lawson explains, traces back to BOP's treatment of his good-time credit: by accounting for 1,005 days of good-time credit in computing his term-in-effect, BOP effectively extended his total sentence by that amount of time. Def.'s Reply to BOP Decl. at 3. Indeed, BOP's calculated term expiration date (February 19, 2031) is <u>exactly</u> 1,005 days after May 21, 2028, the date seven years after Lawson was resentenced. Lawson further notes that BOP's methodology means that, should he lose his already-accrued good-time credit, he will effectively be forced to serve an <u>additional</u> day in custody for each day of credit forfeited. <u>Id.</u> Finally, Lawson proposes an alternative computation methodology: set his current and future good-time credit to the side, add seven years the amount of time he had served as of May 21, 2021 (resulting in a term of 25 years, 7 months, and 10 days), and <u>then</u> apply the various applicable credits against his sentence. <u>Id.</u> at 4. Under this method, Lawson's term expiration date would be exactly seven years from the date Judge Chuang resentenced him (May 21, 2028), and his projected release date, accounting for good-time credit, would be July 21, 2024. <u>Id.</u>

The Court tends to agree with Lawson: previously-accrued good-time credit should not have the effect of lengthening a defendant's sentence, and the forfeiture of good-time credit should not result in a defendant serving <u>extra</u> time in prison.[24] BOP's computation methodology probably

---

[24] Indeed, as the Court understands it, if Lawson had never lost any good-time credit as of May 21, 2021, BOP would have credited him with the full 1,181 days in computing his time-served sentence. This means his total

works without a hitch in the vast majority of cases in which a defendant is resentenced to time served—after all, the internal math is largely irrelevant so long as the inmate is released—but it appears that this methodology has unanticipated adverse consequences when a defendant like Lawson is resentenced to time served but still must serve another consecutive sentence.

Nonetheless, two considerations persuade the Court that, at present, BOP's computation does not warrant a reduction of Lawson's sentence. First and foremost, a federal prisoner arguing that he is being or will be incarcerated longer than is authorized by law has only one available procedural mechanism for raising such a claim: a petition for a writ of habeas corpus under 28 U.S.C. § 2241. E.g., Dufur v. U.S. Parole Comm'n, 314 F. Supp. 3d 10, 16 (D.D.C. 2018) ("[A] federal prisoner . . . [must] bring his claim in habeas . . . if success on the merits will necessarily imply the invalidity of confinement or shorten its duration." (internal quotation marks omitted) (quoting Davis v. U.S. Sent'g Comm'n, 716 F.3d 660, 666 (D.C. Cir. 2013))), aff'd, 34 F.4th 1090 (D.C. Cir. 2022); accord, e.g., Shipp v. Hurwitz, Civ. A. No. 19-1733 (RC), 2019 WL 2996541, at *4 (D.D.C. July 9, 2019). This "habeas-channeling rule"—which traces back to the Supreme Court's decision in Preiser v. Rodriguez, 411 U.S. 475, 487 (1973), and has been fleshed out in several subsequent decisions, see Davis, 716 F.3d at 663–66 (explaining the development of the rule in the D.C. Circuit)—applies to suits challenging sentence computations[25] and to claims

---

term in effect would have baked in 1,181 days instead of 1,005, and thus his sentence would actually have been longer because he had not incurred any disciplinary infractions. This counterintuitive result further suggests that something has gone awry in computing Lawson's sentence.

[25] E.g., United States v. Allen, 124 F. App'x 719, 721 (3d Cir. 2005) ("The exclusive remedy for challenging the BOP's calculation of a federal sentence is a habeas corpus petition filed pursuant to 28 U.S.C. § 2241 . . . ."); see also Chatman-Bey v. Thornburgh, 864 F.2d 804, 808–09 (D.C. Cir. 1988) (en banc) (holding that suit alleging that BOP had erroneously postponed defendant's parole eligibility date eight years by incorrectly aggregating his sentences must proceed in habeas), abrogated in part by Davis, 716 F.3d at 663–66.

regarding deprivation of good-time credits.[26]   Such a petition must be filed in the district of incarceration (not the district of sentencing), Dufur, 34 F.4th at 1096 (citing Rumsfeld v. Padilla, 542 U.S. 426, 443 (2004)); it must name the warden of the petitioner's facility as the respondent, id. (citing Rumsfeld, 542 U.S. at 435); and the petitioner must first exhaust his administrative remedies, e.g., Santiago-Lugo v. Warden, 785 F.3d 467, 475 (11th Cir. 2015).

To his credit, Lawson does not directly challenge the legality of his sentence computation, nor does he ask the Court to order BOP to correct it.   In other words, he studiously avoids arguing that he will be detained longer than authorized by law, an argument he concedes would fall within the habeas-channeling rule.   See Rough Hr'g Tr. at 18:4–13 (conceding that habeas is the proper mechanism for challenging "the accuracy of BOP's computation").   Instead, Lawson focuses on the computation's "unfairness."   Def.'s Reply to BOP Decl. at 4 ("Whether it is wrong under the BOP's regulations or by statute is largely beside the point: this Court can recognize [the computation's] unfairness, and include this consideration as one among many that support Mr. Lawson's compassionate release."); Rough Hr'g Tr. at 20:18–19 ("So whether it is incorrect is not what we are saying.   We are saying that it is unfair."); see also Def.'s Mot. at 27.

The Court appreciates this distinction and, as noted above, tends to agree with Lawson's criticisms of BOP's calculation, whether framed in terms of legality or unfairness.   But given that Lawson's argument closely resembles the type of claim governed by the mandatory habeas-channeling rule, the Court is unwilling to grant compassionate release on the basis of a computation's "unfairness" when the defendant has not yet pursued habeas relief or engaged in

---

[26] E.g., Edwards v. Balisok, 520 U.S. 641, 643–44 (1997) (summarizing Preiser as holding that "the sole remedy in federal court for a prisoner seeking restoration of good-time credits is a writ of habeas corpus"); Schreane v. Seana, 506 F. App'x 120, 123 (3d Cir. 2012).

meaningful dialogue with BOP regarding his objections.[27]   To do so would permit an effective end-run around the mandatory and exclusive procedure for challenging the execution of criminal sentences: a habeas petition.   Indeed, the Third Circuit recently suggested that objections to a sentence computation may not even be considered when raised in a motion for compassionate release.   See United States v. Williams, 844 F. App'x 485, 486 n.1 (3d Cir. 2021) ("To the extent that [defendant's] [compassionate release] motion raised challenges to the computation of his sentence . . . the District Court properly declined to consider those aspects of the motion . . . . [because] a challenge to the BOP's execution of a sentence is properly brought under 28 U.S.C. § 2241." (cleaned up; citation omitted)); see also United States v. Sutherland, Case No. 3:17-CR-131, 2020 WL 3251030, at *3–4 (M.D. Pa. June 16, 2020).   This Court does not go quite that far— after all, one purpose of compassionate release is to provide relief where even the proper operation of law results in manifest injustice or significant individual hardship.   Cf. Concepcion v. United States, No. 20-1650, 2022 WL 2295029, at *4 (U.S. June 27, 2022) ("It is only when Congress or the Constitution limits the scope of information that a district court may consider in deciding whether, and to what extent, to modify a sentence, that a district court's discretion to consider information is restrained.").   Nonetheless, the Court cannot conclude that the alleged "unfairness" of a sentence computation supports compassionate release when no attempt has been made to pursue the exclusive judicial remedy for correcting an illegal sentence computation.[28]

---

[27] To be clear, this lack of meaningful engagement is BOP's fault, not Lawson's.  Lawson represents that he has been trying to address this issue with BOP since the October 26, 2021 computation, see Def.'s Mot. at 27 ("Counsel has repeatedly sought clarification [from BOP regarding its computation of Lawson's sentence] and received none."), and he flagged some of his concerns with the computation in his December 2 supplemental request for compassionate release, see Dec. 2 Request at 1 ("Mr. Lawson's sentence computation does not reflect the expectation of Judge Chuang's compassionate release grant in the District of Maryland.").  Instead, it has only been with this Court's intervention that Lawson has finally received a straight answer from BOP explaining his sentence computation.  Now that BOP's rationale is clearer, the Court expects Lawson to continue pursuing internal resolution and, more importantly, it expects BOP to meaningfully engage with Lawson's (and the Court's) concerns in good faith.

[28] Lawson cites United States v. Lopez, 534 F. Supp. 3d 573 (E.D. Va. 2021), to support his argument that compassionate release is a proper remedy for errors in applying a federal inmate's sentence.  In that case, the defendant

In addition, compassionate release is ill-suited to address Lawson's objections.  For one, the computation's alleged flaws do not support <u>release</u> at all: that Lawson is set to be released in 2027 instead of 2024 has no bearing on whether he should be released <u>now</u>.  And although Lawson correctly notes that the Court could instead reduce his sentence by an amount that would offset the flaws in BOP's computation methodology, Rough Hr'g Tr. at  18:12–22, the Court can make little more than a guess as to the size of that reduction given the still-obscure math that has gone into computing Lawson's sentence.  No such issues would trouble a habeas court, which will have the authority to, if necessary, directly order BOP to alter its computation.[29]  In other words, habeas offers a scalpel while compassionate release provides only a hammer.  Moreover, reducing Lawson's sentence is a permanent fix for a problem that may very well be temporary.  The Court has expressed its expectation that BOP will meaningfully engage with Lawson's—and the Court's—concerns in good faith, and, as noted above, Lawson has at least a plausible claim for

---

faced a 211-month federal sentence and a 12-month sentence from a Virginia state court, but despite the federal sentencing judge repeatedly ordering that the federal and state sentences be served concurrently, the Virginia Department of Corrections ("VDOC") maintained that the sentences must be served consecutively.  <u>Id.</u> at 575–78.  Noting that "without . . . a reduction, Defendant will be incarcerated for a term that exceeds and is directly contrary to the express order of the sentencing judge," <u>id.</u> at 578, the court reduced the defendant's federal sentence by twelve months, ensuring that the defendant would only serve the intended 211-month sentence.

<u>Lopez</u> is distinguishable from this case in several respects.  First and foremost, Lopez had already tried and failed to obtain his desired relief via a § 2241 habeas petition before he resorted to compassionate release.  <u>See</u> <u>Lopez v. Ormond</u>, Civ. A. No. 2:18-cv-322, 2019 WL 3365850 (E.D. Va. June 18, 2019) (recommending that Lopez's § 2241 petition be denied because "this court lacks any authority to order VDOC to commence Lopez's state sentence or designate Lopez's present federal facility for service of that sentence"), <u>adopted</u>, 2019 WL 3366554 (E.D. Va. July 24, 2019); <u>see also</u> <u>Lopez</u>, 534 F. Supp. 3d at 576–78 (noting various other alternatives Lopez had previously attempted).  In addition, the issues in <u>Lopez</u> were far more certain than they are here: the federal sentencing judge had been extremely clear that Lopez's sentences should be concurrent, and VDOC had been equally insistent that they run consecutively.  Here, however, the proper length of Lawson's total aggregate sentence is the very question in dispute.  Relatedly, calculating the reduction requested in <u>Lopez</u> required only elementary arithmetic, but, as discussed below, this Court remains somewhat at sea as to how much it would have to reduce Lawson's sentence in order to compensate for BOP's allegedly unfair computation methodology.

[29] It appears that there is no written law—be it statute, regulation, or BOP program statement—governing how to compute a time-served sentence when a defendant is still subject to a sentence to be served subsequently.  <u>See</u> Gov't Reply to BOP Decl. at 2; <u>see also</u> Def.'s Reply to BOP Decl. at 4.  This may complicate Lawson's task of showing that BOP's computation is unlawful.  In this Court's view, however, BOP's sentence computations should not be effectively immune from review simply because no written policy governs the precise situation in question.  If Lawson does pursue habeas relief but his petition is denied on the ground that no law specifically dictates BOP's computation, Lawson is welcome to renew his motion for compassionate release.

habeas relief.  So long as that more appropriate (and arguably mandatory) remedy remains untried, the Court cannot conclude that any alleged unfairness in BOP's computation of Lawson's sentence supports reducing his sentence.

### D.      Lawson's Rehabilitation While Incarcerated

Lawson's final argument in favor of compassionate release is his record of rehabilitation while incarcerated.  At the outset, the Court notes that Congress has specifically instructed that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason" for purposes of compassionate release.  28 U.S.C. § 994(t).  But § 994(t) specifies only that rehabilitation <u>alone</u> may not suffice—courts therefore may still consider a defendant's rehabilitation in combination with other reasons warranting a sentence reduction.  <u>E.g.</u>, <u>United States v. Stephenson</u>, 461 F. Supp. 3d 864, 873 (S.D. Iowa 2020) ("For the word 'alone' to do any work—as it must—that means courts can consider rehabilitation as <u>part</u> of a compassionate release motion."); <u>United States v. McCoy</u>, 981 F.3d 271, 286 n.9 (4th Cir. 2020) ("[T]here is no indication that successful rehabilitation efforts may not be considered as one among other factors under § 3582(c)(1)(A)(i) . . . .").

Lawson points to several commendable features of his prison record.  He has had a perfect disciplinary record for almost seven years, Def.'s Mot. at 35–36; Def.'s Ex. 10 [ECF No. 209-10] at 2; none of his previous infractions involved fighting or violence, Def.'s Mot. at 36; and he has availed himself of BOP's available programming, including completing the Non-Residential Drug Abuse Program in 2012 and a 300-hour course on appliance repair in 2011, <u>id.</u> at 35; Def.'s Ex. 10 at 1, 3; Gov't Ex. F [ECF No. 217-3].  Lawson also submitted two personal statements describing his upbringing, the circumstances surrounding his crimes, and his subsequent change in mindset while in prison, Def.'s Ex. 1 [ECF No. 209-1], and the Court has further reviewed

several letters of support from his family and friends, Def.'s Ex. 3 [ECF No. 209-3], and three

letters from staff members at FCI Coleman attesting to his positive conduct while incarcerated,

Def.'s Ex. 2 [ECF No. 209-2]; Def.'s Mot. at 36; cf. United States v. Douglas, Crim. A. No. 10-

171-4 (JDB), 2021 WL 214563, at *8 (D.D.C. Jan. 21, 2021) ("Douglas II") ("Courts have found

letters from prison staff—'written by the unbiased people who have spent more time with

[defendant] than anyone else—to be powerful evidence of his rehabilitation.'" (alteration in

original) (quoting United States v. Rodriguez, 492 F. Supp. 3d 306, 312 (S.D.N.Y. 2020))).

The government paints a less rosy picture. Lawson, it argues, has not exhibited "a genuine

and consistent effort to avail himself of the training opportunities BOP offers," Gov't Opp'n at 35:

although he has completed 513 total hours of programming, that works out to only 2.5 hours of

programming per month of incarceration. Moreover, Lawson has completed only 16 hours of

coursework—a class on music theory—since 2015. Id.; see also Gov't Ex. F. The government

also directs the Court's attention to Lawson's extensive disciplinary history prior to 2015, a history

which includes four 100-level offenses, the most serious category of infraction. Gov't Opp'n at

34; see generally Gov't Ex. E [ECF No. 217-2]. Three of these 100-level citations were for

possessing a dangerous weapon.[30] See Gov't Opp'n at 34; Gov't Ex. E at 2–3; Def.'s Ex. 10 at 2.

The government's points are well-taken. Lawson's disciplinary record is long and includes

some concerning conduct. Cf. Stephenson, 461 F. Supp. 3d at 873 (noting that defendant's

rehabilitation supported compassionate release in part because he had "maintained a clear

disciplinary record [over fifteen years of incarceration], no minor feat in any prison"); Rodriguez,

451 F. Supp. 3d at 405 ("[Defendant] has had only two infractions in seventeen years of

---

[30] Lawson explains that in 2009 he felt he needed a weapon for protection in a particularly violent institution, giving rise to his first two 100-level infractions, see Def.'s Reply at 29–30, and he denies that the weapon underlying his third citation belonged to him, id. at 30; see also Gov't Ex. E at 2 (reflecting that Lawson denied this charge at the time as well).

incarceration . . . ."); Douglas II, 2021 WL 214563, at *8 (noting the defendant's "clean disciplinary record . . . over decades of incarceration" as a reason that the § 3553(a) factors supported compassionate release). And his 513 hours of programming are less indicative of "extraordinary rehabilitation" when placed in broader context. Cf. Rodriguez, 492 F. Supp. 3d at 313 ("[Defendant] has also compiled an outstanding record with prison programming, having completed several courses, earned his GED, and finished a 4,000-hour technology apprenticeship program."); Douglas II, 2021 WL 214563, at *8 (noting that defendant "ha[d] completed thousands of additional hours of educational, vocational, and therapeutic programming, much of which has focused on taking responsibility for his past actions and developing skills in nonviolent conflict resolution" and that he had become a "role model for younger inmates" with a "profound commitment to mentorship").

But on the whole, the evidence of Lawson's rehabilitation is favorable. The Court was particularly moved by his sincere and thoughtful personal statements and by the letters from prison staff and from various friends and family members evincing their support. The Court heartily commends Lawson on the progress he has made while incarcerated—from the present record, it seems that Lawson is a very different person from the young man this Court sentenced eighteen years ago.

As Lawson concedes, however, rehabilitation cannot constitute an extraordinary and compelling reason on its own—it can only tip an already-strong case for compassionate release over the edge. See Rough Hr'g Tr. at 27:4–6 ("I think the hurdle [posed by § 994(t)] is . . . that [rehabilitation] alone is not a reason. So I don't see it as a hurdle when there are other reasons [warranting compassionate release]."). While Lawson's record of rehabilitation certainly does not cut against his case for compassionate release, it is not—nor is it permitted to be—an extraordinary

and compelling reason warranting compassionate release on its own.  The question is ultimately whether his <u>other</u> arguments support reducing his sentence.

Lawson appears to acknowledge that his proffered reasons for release may not be "extraordinary and compelling" on their own.  Instead, he argues vigorously—and correctly—that a collection of reasons each falling short of "extraordinary and compelling" can, if considered together, still justify compassionate release.[31]  And the Court has taken that possibility seriously in this case, assessing each of Lawson's arguments for release individually but also weighing the group collectively.  In the end, however, Lawson's proffered reasons, both on their own and together, fall short of "extraordinary and compelling"—indeed, they support release only minimally if at all.  Any errors or subsequent changes in the law pertaining to Lawson's sentence on Count One would have had no impact on his effective aggregate sentence; Lawson's choice not to receive a vaccine effectively precludes compassionate release on the basis of COVID-19; the alleged unfairness of BOP's sentence computation is not an appropriate ground for sentence reduction when Lawson has not sought to correct the computation directly via a habeas petition; and Lawson's favorable but mixed record of rehabilitation offers limited support for reducing his sentence.  This is not a case where various proffered reasons each fall just short of the line but may be "extraordinary and compelling" when considered together—Lawson cannot demonstrate an extraordinary and compelling reason for release by aggregating several independently unsupportive arguments.

---

[31] <u>E.g.</u>, Def.'s Mot. at 29–30 (collecting cases); <u>McCoy</u>, 981 F.3d at 286 (affirming grants of compassionate release relying on combination of factors); <u>United States v. Owens</u>, 996 F.3d 755, 763 (6th Cir. 2021) (remanding compassionate release motion to district court to consider whether a combination of three factors warranted sentence reduction).  <u>But see</u> <u>United States v. McKinnie</u>, 24 F.4th 583, 588–89 (6th Cir. 2022) (suggesting that <u>Owens</u> is not good law and expressing skepticism that "unrelated factors, each individually insufficient to justify a sentence reduction, [can] amount to more than the sum of their individual parts").

## <u>Conclusion</u>

As is hopefully apparent, the Court is sympathetic to Lawson's situation, and its decision on the present motion should not be misread to imply that Lawson <u>deserves</u> to stay in prison. Rather, the Court is constrained by its view, drawn from the text of the compassionate release statute itself, that "[c]utting short a duly authorized prison sentence is . . . an 'extraordinary' step to take, and it requires a justification which is more than sympathetic and indeed nothing short of 'compelling.'" <u>Shabazz</u>, 2021 WL 4306129, at *3.  On the grounds presented in this motion and at this stage in the proceedings, the Court concludes that Lawson has not presented an extraordinary and compelling reason warranting a sentence reduction.[32]  The Court will, accordingly, deny his motion.

/s/
JOHN D. BATES
United States District Judge

Dated: <u>July 11, 2022</u>

---

[32] In light of this conclusion, the Court need not and does not address whether the sentencing factors under 18 U.S.C. § 3553(a) support a reduction in Lawson's sentence.  <u>See, e.g.</u>, <u>Morales</u>, 2021 WL 4622461, at *8 ("[A]n inmate may not be granted compassionate release without a finding of an extraordinary and compelling reason, no matter how the § 3553(a) factors shake out." (quoting <u>Shabazz</u>, 2021 WL 4306129, at *6)).